### In re COMPUTER LEARNING CENTERS, INC., Debtor.

### No. 01–80096–RGM.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Oct. 5, 2001.

---

Raymond R. Pring, Jr., Gold Morrison & Laughlin, PC, McLean, Virginia, for trustee.

James D. Sadowski, Greenstein De-Lorme & Luchs, P.C., Washington, D.C., for Mack–Cali–R Company.

### MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

This motion concerns a landlord's mistaken computation of its cure payment under § 365 of the United States Bankruptcy Code and the chapter 7 trustee's opposition to the correction of the $123,241.73 mistake. Computer Learning Centers, Inc. ("CLC") filed a voluntary petition in bankruptcy pursuant to chapter 7 of the Bankruptcy Code in this court on January 25, 2001. CLC provided computer-related training courses to more than 9,000 students at 25 locations throughout the United States and employed more than 1,600 people. H. Jason Gold was appointed trustee and immediately began an extensive national marketing campaign to sell the schools as going concerns. Time was of the essence. Classes had been suspended January 22, 2001, rent accrued at the rate of more than $1 million a month, and there were no funds available to operate the schools.

On February 9, 2001, the trustee implemented a sealed bid auction of the debtor's assets. The auction was extensively publicized. The publicity included national newspaper advertising in the Wall Street Journal, the Washington Post, the Chronicle of Higher Education and other newspapers; direct mailings to more than 8,740 computer instruction companies, 5,000 computer dealers and 4,000 commercial leasing brokers; an extensive internet marketing effort; and an aggressive tele-marketing campaign. The auction was exceptionally successful. The trustee received 47 bids from 27 different bidders. Most of the bids were for the schools on a going concern basis. These bidders proposed to purchase all of the assets at a particular location, including the debtor's leasehold interest which was to be assumed by the trustee and assigned to the successful bidder. In each instance, the bidder intended to continue operating a computer training school. The sales as going concerns not only maximized the value of the assets but also minimized potential student claims by permitting the students enrolled in the schools to complete their studies with minimal interruption. One of the schools sold as a going concern was in Plymouth Meeting, Pennsylvania. The purchase price was $2,000,000; however, if two other bids by the same bidder were also accepted, the bidder agreed to pay a premium of

$1,000,000, and if all other bids by the same bidder were accepted, the bidder agreed to pay an additional premium of $1,500,000.[1]

The trustee filed an emergency motion on March 19, 2001, seeking approval of the sale of the assets to the highest bidders and the assumption and assignment of the unexpired leases. The proposed sales included the Plymouth Meeting, Pennsylvania, school and the assumption and assignment of its lease. The trustee's Memorandum of Points and Authorities in support of his motion ("Memorandum") asserted that the proposed sales were in the best interests of the estate and that each transaction represented the highest and best offer received after extensive advertising and the direct mail campaigns. The trustee represented that the only defaults under the leases were post-petition rent, that is, rent for the months of February and March 2001, and that he would have sufficient funds on hand from the proceeds of the sales to cure all lease defaults. Neither the motion nor the Memorandum itemized the amounts necessary to cure the various lease arrears. The notice period was shortened at the trustee's request and the motion was granted after a hearing on March 28, 2001. The order approving the sales ("Sales Order") itemized the cure payment for each lease and directed that they be paid within five business days after closing. The cure payment for the Plymouth Meeting lease was set out as $23,727.83. The landlord, Mack–Cali–R Company No. 1 L.P. ("Mack–Cali"), provided this amount to the trustee and did not object to the sale of the assets or the assumption and assignment of its lease.

The cure payment was made to Mack–Cali. However, in processing the payment Mack–Cali discovered that it had made a mistake. The actual cure amount was $146,969.36. On June 1, 2001, after Mack–Cali had unsuccessfully sought the trustee's consent to a modification of the Sales Order, it filed the motion presently under consideration to correct the mistake and require the trustee to pay the additional $123,241.73. Mack–Cali's motion stated that the debtor had twice expanded the leased space. When the lease was first executed, an account was established for the original space. When the debtor expanded the space, a separate account was established for the rent due under the expansion. In all, there were three rent accounts. The monthly rental for the original space was $33.687.88; for the first expansion space. $6,994.00; and for the second expansion space, $8,205.00, all plus utilities, taxes and operating expenses. The accounts receivable manager who actually compiled the cure payment mistakenly reported only the arrears on the second expansion space. She overlooked the

---

1. The debtor was unable to reorganize. The United States Department of Education asserted a liability in excess of $180,000,000 for various violations of Title IV of the Higher Education Act of 1965. The Department originally took the position that any purchaser of a school would not be eligible to participate, at the school purchased, in federal student financial assistance programs authorized by Title IV for a period of two years after the purchase of the "tainted" assets. This substantially limited the value of the assets and effectively precluded going concern sales. Based on this position, the debtor estimated that the liquidation value of its assets was under $6,000,000. The trustee with the able assistance of Michael B. Goldstein of Dow, Lohnes & Albertson, PLLC, convinced the Department that it was in the government's and the student's best interests to waive the disqualification. With the waiver, which was approved by the court on March 7, 2001, the trustee received $20,000,000 from the sale of the schools. The debtor would not have been able to effect this settlement.

other two accounts. She had been employed by Mack–Cali for six months. Her testimony, presented without objection by affidavit, was uncontested by the trustee. Only the trustee opposed the motion.

### Trustee's Opposition

The trustee argues that Fed.R.Bankr.P. 9024 which incorporates Fed.R.Civ.P. 60 does not encompass these circumstances. He argues in his Opposition to Motion of Mack–Cali ("Opposition") that Rule 60(a) is not applicable because the mistake was one of substance, not of calculation, that it "strikes to the heart of the parties' transaction" and that he "never agreed to pay all alleged rent arrearages in connection with the Plymouth Meeting Lease. Instead, the 'deal' struck between the parties was articulated in the Sale Order" and limited the amount he would pay. Opposition at 5–6. Moreover, he argues, Rule 60(b) is not applicable. Relief under Rule 60(b) is extraordinary and only to be invoked upon a showing of "exceptional circumstances." *Compton v. Alton Steamship Co., Inc.,* 608 F.2d 96, 102, 106 (4th Cir.1979) (relying on Rule 60(b)(6) to vacate judgment "when unquestionably there was no basis whatsoever either in fact or in law for such a judgment"). This is especially true with consent orders and settlements reached after a full opportunity for a trial or a hearing before the court. *Home Box Office, Inc. v. Spectrum Electronics, Inc.,* 100 F.R.D. 379, 382 (E.D.Pa. 1983) (consent order vacated). Opposition at 7. In any event, the mistake was "unexplained carelessness" which does not meet the standards of excusable neglect. Opposition at 7. Finally, the trustee claims to have reasonably relied upon the cure amount provided by the landlord in his negotiations with the purchaser. Opposition at 8.

### Discussion

■ "To err is human."[2] Rule 60 seeks to mitigate this human frailty, and thereby promote a more perfect justice. The errors that Rule 60 permits to be corrected are generally classified as either clerical errors or substantive errors. Fed.R.Civ.P. 60(a) and Fed.R.Civ.P. 60(b), respectively. Rule 60(a) is designed to assure that the court's records accurately reflect and effectuate the actual proceedings and decisions of the court and the parties. An error that merely misstates what was actually done or decided is a clerical error and may generally be corrected pursuant to Rule 60(a). *Robi v. Five Platters, Inc.,* 918 F.2d 1439, 1445 (9th Cir.1990). If an order accurately reflects the court's ruling, even though the court's ruling is in error, relief under Rule 60(a) is not available. *In re Craddock,* 149 F.3d 1249, 1254 n. 4 (10th Cir.1998); *Warner v. City of Bay St. Louis,* 526 F.2d 1211 (5th Cir.1976). Such an error is a substantive error, not a clerical error. Relief may be available, however, under Rule 60(b). 12 Moore's Federal Practice ¶ 60.02 (3rd ed., 2001).

The distinction between clerical errors and substantive errors is not always easily discerned. Arithmetic miscalculations are classic clerical mistakes. For example, if the parties agree to settle a matter for the total of the amounts itemized on a schedule, Rule 60(a) is available to correct an order that is the result of an arithmetic miscalculation of the total. The parties' intention would be frustrated if the order were not corrected. One party would obtain a windfall at the expense of the other. *United States v. Kellogg (In re West Texas Mktg. Corp.),* 12 F.3d 497 (5th Cir.1994)

---

**2.** Alexander Pope, *An Essay on Criticism,* pt. ii, line 525.

illustrates the application of Rule 60(a).[3] The issue in controversy was the proper amount of a tax refund. The government asserted that it had miscalculated the refund and overpaid it by $928,326.63. Despite the large amount involved, the Court of Appeals held that the parties had agreed on what claims were to be included in the refund but had not calculated or agreed on the total amount of the refund. The IRS computed the refund and paid it. Later it discovered that it had overpaid the taxpayer and sought relief. The court held that if the government showed that a refund overpayment paid to the bankruptcy trustee did not reflect the parties' intentions and resulted from a computational error, then the error could be corrected under Rule 60(a). *West Marketing* also illustrates that the magnitude of the error in terms of dollars is not itself determinative, although it may be relevant evidence in determining whether the change sought is a mathematical error or a new theory of the case. Errors can be large or small; significant or insignificant.

■ All circumstances should be considered in determining whether an error was a true computational error or a substantive error. For example, a court may consider whether the parties agreed on the method to determine a monetary award rather than the amount of the award itself; whether liability was seriously disputed or was compromised; whether the amount of damages was relatively fixed or reasonably determinable by reference to an agreed standard or was substantially disputed; whether the information from which the award was to be computed was readily available and if so, by whom; and the reason for the error

itself. If it is determined that the error was substantive, relief is not available under Rule 60(a) although relief—albeit more circumscribed—may be available under Rule 60(b).

### *Relief Under Rule 60(a)*

■ In this case the error was computational and not substantive. While the trustee earnestly argues that the cure payment set out in the Sales Order was a negotiated "deal", the record simply does not support his contention. A chapter 7 trustee occupies a unique position. He is charged with impartially administering the estate entrusted to him. He is the representative of all the creditors, not merely some of them. At times he must propose actions that may be detrimental to particular creditors or oppose requests that may be favorable to others. He does so not because he is presented with opportunity or a weak or unsophisticated creditor, but because he is required to do so by the Bankruptcy Code in order to achieve the balance among the creditors established by Congress in the Bankruptcy Code. Where the controlling law is clear and the amount due can be easily computed, the trustee should follow the rules established by Congress and should not seek to negotiate a "deal." Any "deal" is bound to alter the balance created by Congress, benefitting some creditors at the expense of others.

Here, § 365 clearly sets forth the prerequisites to assuming the leases addressed in the Sales Order. The trustee is required to cure the defaults, compensate for any damages and provide adequate assurance of future performance. 11 U.S.C. § 365(b). This was never in question. The trustee recited the require-

---

**3.** Relief was limited to Rule 60(a) because the motion to correct the error was made more than one year after the entry of the allegedly erroneous order. Rule 60(b) has a one-year deadline for most substantive errors. *See Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 393, 113 S.Ct. 1489, 1497, 123 L.Ed.2d 74 (1993).

ments in his Memorandum and quoted § 365(b). Memorandum ¶ 34. In the next paragraph the trustee stated:

> The only defaults under the Leases of which the Trustee is aware are that the Debtor owes postpetition rent. Except where otherwise agreed by the landlords, the Estate will cure all defaults as of the Closing Dates for each respective transaction from the proceeds of sale or other available funds. The Trustee has on hand sufficient funds to cure all lease defaults.

Memorandum at ¶ 35. Neither the motion to sell, the notice to creditors nor the Memorandum contained a schedule of the amount of the cure payments. All three documents were filed on March 19, 2001. The trustee acknowledged at the hearing on Mack–Cali's motion that he did not know at that time the precise arrearages on the leases.

The trustee did an outstanding job in promptly assembling a team that quickly and effectively marketed assets scattered throughout the United States and realized millions more than the debtor had estimated less than 60 days earlier.[4] He established an auction mechanism for the sales and obtained the highest and best prices. The prices were independent of the trustee's continuing rental obligations. The trustee knew that the monthly rental obligations were substantial and that all rent was paid through January 2001. He knew that he had to pay the arrearages in full from the settlement proceeds. What he did not know was the exact amount of each landlord's cure claim. He relied on the landlords to provide the cure amounts set out in the Sales Order and reserved the right to recover overpayments.[5]

The record reflects no question of liability or of the requirement to pay the full cure payment. Although the trustee did not know the exact amount of the cure payment and relied on the landlord to provide the amount, nothing in the record suggests a dispute as to the basis for or the manner in which the cure payment would be computed or that the trustee sought to pay less than the full cure payment. No dispute was identified. No compromise was suggested. No motion to approve a settlement was filed. The plain reading of the trustee's motion to sell and his Memorandum in support of the motion is that the trustee intended to pay the full cure payment from the proceeds of sale. He relied upon the landlord to provide the amount and the documentation supporting the amount and reserved the right, for a limited period of time, to recover any overpayment. What was critical to the sale motion and was agreed upon by the trustee and the landlord was that the full cure amount, not a particular cure amount, be paid. The precise amount was to be computed in the first instance by the landlord, subject to the trustee's verification. At the time the order was presented, the landlord had made his computation—albeit incorrectly—but the trustee had not completed his verification. The explicit reservation addressing the trustee's right to recover overpayments does not evince a

---

4. As noted above, this result would not have been achieved without the settlement with the Department of Education, a settlement that the debtor would not have been able to effect.

5. Paragraph T of the Sales Order provided: Notwithstanding the Trustee's payment of the Cure Amounts, and the assumption and assignment of the Real Property Leases, the Trustee shall retain the right to recover any overpayments made to landlords in connection with curing the lease defaults for a period of 60 days after the Trustee receives from the landlords all necessary supporting documentation for the Cure Amounts as requested by the Trustee, and landlords reserve the right to contest the same.

"deal" or a negotiated settlement, but a recognition of the possibility of errors occurring in the compressed time available to the parties. The reservation established for the trustee a remedy in addition to Rule 60(a) in the event of an error. The additional remedy was limited in time and neither waived relief under Rule 60(a) by any party nor converted an agreed mechanism to pay the post-petition arrears in full to payment of a fixed amount less than the full payment required by § 365(b).

In this case, the parties agreed on full payment as required by the Bankruptcy Code, not a particular payment. Liability was never disputed. The amount of the cure payment was readily determinable by reference to the written lease, lease amendments, and the records of the parties, none of which were disputed. The manner in which the error arose, the failure of a relatively new employee to take into account all of the rental accounts covering the Plymouth Meeting lease, does not evince a different theory of liability or a disagreement as to the amount of the liability, but rather a failure to include all agreed upon amounts in the computation. Taking all factors into consideration, it is clear that this was a clerical error that may be corrected under Rule 60(a).

### Relief Under Rule 60(b)

■ If the error were classified as a substantive error, it would be correctable under Rule 60(b). Rule 60(b) permits a court to relieve a party from an order based upon "mistake, inadvertence, surprise, or excusable neglect." *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), addresses excusable neglect in the context of Fed.R.Bank.P. 9006. In the course of its discussion, the Supreme Court refers to and relies upon Fed.R.Civ.P. 60(b). It held that the deter-mination of whether there has been excusable neglect is "at bottom an equitable one." 507 U.S. at 395, 113 S.Ct. at 1498. The determination should take into account all relevant circumstances, including the danger of prejudice, the length of delay and its potential impact on judicial proceedings, the reason for the delay, whether the reason for the delay was within the reasonable control of the movant and whether the movant acted in good faith. *Pioneer* concerned a late proof of claim in a chapter 11 case. The factors the Supreme Court enumerated reflect the type that should be considered in other types of cases, recognizing that errors result from a variety of circumstances. For example, in setting aside a default judgment, the Court of Appeals for the Fourth Circuit has established three thresholds that must be met: (1) whether the motion is timely; (2) whether the responding party will suffer unfair prejudice if the default judgment is set aside; and (3) whether the claim is meritorious. *See Heyman v. M.L. Marketing Co.*, 116 F.3d 91, 94 n. 3 (4th Cir.1997). The factors essentially balance the relative prejudice to the parties, the good faith of the movant and the reasons for the error. There is no separate requirement that there be "exceptional circumstances."

The trustee does not contest that the landlord made a substantial mistake or that the landlord is proceeding in good faith. He argues that he would be unfairly prejudiced if the error were corrected and that the error is not excusable. The trustee is not unfairly prejudiced if the error is corrected. He was prepared to pay the full cure amount, whatever it might have been, as he was required to do under § 365(b). As discussed above, the trustee did not rely on the landlord's cure amount in accepting the bid. The bid accepted was the highest bid submitted in a public auction. The amount of the trust-

ee's cure payment was not known when the winning bid was submitted or accepted. The trustee did not consider his expenses in accepting the bid, but rather the income generated by the bid. Merely requiring the trustee to pay the correct cure amount is not prejudice to the estate. Paying the smaller, incorrect amount would surely be a windfall to the estate, but denial of a windfall is not prejudice.[6] *Compton,* 608 F.2d at 103 ("One cannot be prejudiced by the loss of that to which he was not entitled."); *In re Wing,* 55 B.R. 91 (Bankr.D.C.1985).

Moreover, the trustee shares some responsibility for failing to discover the error before entry of the Sales Order. He had a fairly good idea of the magnitude of the cure payment from his review of the lease.[7] He knew that the January 2001 rent had been paid and that the only arrearage was post-petition rent for February and March 2001. In the case of the Plymouth Meeting lease, he knew that the combined monthly rent without utilities, taxes and operating expenses was close to $50,000. The cure payment should have been at least $100,000. The $23,727.83 cure amount provided by the landlord was clearly inadequate. The trustee himself should have recognized the gross disparity between the arrears he must have estimated and the cure payment provided by the landlord.

The mistake is excusable. There is no indication that the employee was not properly trained or supervised. There is no suggestion that the bookkeeping system maintained by the landlord was inadequate. The employee was relatively new, but not inexperienced in her job. The time available was reduced at the request of the trustee due to the trustee's need to effect an immediate sale. This reduced the opportunity to verify the information. Given all the circumstances of the case, the error was the result of the neglect of the landlord's employee, but the neglect is excusable.

### *Conclusion*

The landlord's motion for relief under Rule 60 will be granted and the trustee will be ordered to pay the landlord the balance of the cure payment.

---

**6.** The situation might be different if the correct cure amount were such that the trustee would have rejected the leases and all bids for the property. The facts would have had to have been substantially different to satisfy this approach in this case. The erroneous information would have had to have been given to the trustee early enough in the process to have induced the trustee to have marketed the lease rather than to have immediately rejected it. Unpaid post-petition rent is generally an administrative expense that must be paid whether the lease is assumed or rejected.

**7.** The trustee stated that "[t]he proposed transactions with the Purchasers ... represent the exercise of reasonable business judgment by the Trustee." Memorandum at ¶ 19. In reaching this business judgment the trustee must have performed his due diligence. This would normally include at least a basic review of the leases. He must have determined whether the leases had significant value arising from below-market rent. Without this basic information he could not have represented to the court and the creditors that the value received for creditors had been maximized. Memorandum at ¶ 13.